UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TERESA JUNE WHITEFORD,

        Plaintiff,

    v.                              CASE NO. 3:20-CV-1115-MAP

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

_____/

## ORDER

      This is an action for review of the administrative denial of disability insurance benefits (DIB) and period of disability benefits. *See* 42 U.S.C. § 405(g). Plaintiff contends the Administrative Law Judge (ALJ) failed to (1) include limitations associated with her lumbar Tarlov cysts in formulating Plaintiff's residual functional capacity (RFC); (2) consider the severity of her migraines; and (3) properly weigh the medical opinions. After considering the administrative record (doc. 14) and the parties' arguments (docs. 21, 23), I find that substantial evidence supports the ALJ's decision. I affirm.

      *A.    Background*

      Plaintiff Teresa Whiteford alleges she became disabled on August 31, 2017, due to headaches with occipital nerve pain; cervical pain and disc degeneration with stenosis; shoulder pain with muscle spasms; lumbar pain with muscle spasms, cysts, and stenosis; irritable bowel syndrome (IBS); and anxiety (R. 272) Plaintiff's date of last insured (DIB) is December 21, 2021; she must show she became disabled by this date to receive benefits. (R. 23)

Plaintiff was 55 years old at her October 17, 2019 administrative hearing. (R. 45)  She is a high school graduate with past work experience as a financial aid officer at Jones College, a job she held from 1989 until the college closed its doors in 2017. (R. 47)  She testified that even if Jones College had remained open, she could not have continued to work due to her functional limitations.  For example, she often showed up late because of IBS flare-ups, and she had trouble sitting at a desk all day. (R. 70-71)  In her words:  "I had difficulty walking and I had an office assistant who was constantly correcting my errors that I was making, looking for documents that I had misfiled or attached to the one record." (R. 69)  Plaintiff "did everything . . . to make things work," including using her mouse with her left hand instead of her right, moving her monitor around on her desk, and trying different keyboards. (*Id.*)  But "[t]his went on for probably a year or so until it just – it got to the point that I – I couldn't – I couldn't do it anymore." (*Id.*)

Plaintiff lives with her husband and son.  She dresses herself but struggles to pull shirts over her head. (R. 52)  She does "very limited" household chores because of her back and neck pain. (R. 53)  Her grip strength has diminished.  For example, she testified she can hold a hammer but cannot nail two boards together without getting muscle spasms in her neck. (R. 54)  She drives only short distances and wears a back brace when she grocery shops at Publix. (R. 57)  Plaintiff attends church at least once a week and socializes with friends. (R. 60)

After a hearing, the ALJ found, in a November 12, 2019 decision, that Plaintiff suffers from the severe impairments of osteoarthritis and dysfunction of major joints (R. 23)  Despite these impairments, the ALJ determined that Plaintiff was not disabled because she retained the RFC to perform light work with limitations:

> She can occasionally lift and carry 20 pounds, and she can frequently lift and carry 10 pounds. She can push and pull as much as she can lift and carry. She can sit for six hours out of an eight-hour workday. She can stand or walk for a total of four hours out of an eight-hour workday. She can frequently climb, balance, stoop, kneel, crouch and crawl.

(R. 24) After consulting a vocational expert (VE), the ALJ found that, with this RFC, Plaintiff could perform her past relevant work, which the VE classified as a skilled, sedentary position. (R. 34, 84) Plaintiff appealed the ALJ's decision to the Appeals Council (AC), which denied review.[1] (R. 2) Her administrative remedies exhausted, Plaintiff filed this action.

### B.    Standard of Review

To be entitled to DIB, a claimant must be unable to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A). A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *See* 42 U.S.C. § 423(d)(3).

The Social Security Administration, to regularize the adjudicative process, promulgated detailed regulations. These regulations establish a "sequential evaluation process" to determine if a claimant is disabled. *See* 20 C.F.R. § 404.1520. If an individual is

---

[1]  Plaintiff submitted a letter to the AC from out-of-state neurosurgeon Frank Feigenbaum, M.D. that post-dates the ALJ's decision. (R. 10) Mr. Feigenbaum wrote that Plaintiff's spinal cysts could cause nerve root compression and Plaintiff needed a diagnostic nerve root block. (*Id.*) The AC found that this additional evidence does not relate to the period at issue (R. 2), and in her brief Plaintiff did not challenge the AC's denial of her request for review of the ALJ's decision (*see* Doc. 21).

found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a)(4). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment(s) (*i.e.*, one that significantly limits her ability to perform work-related functions); (3) whether the severe impairment meets or equals the medical criteria of Appendix 1, 20 C.F.R. Part 404, Subpart P; (4) considering the Commissioner's determination of claimant's RFC, whether the claimant can perform her past relevant work; and (5) if the claimant cannot perform the tasks required of her prior work, the ALJ must decide if the claimant can do other work in the national economy in view of her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4). A claimant is entitled to benefits only if unable to perform other work. *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 404.1520(f), (g).

In reviewing the ALJ's findings, this Court must ask if substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The ALJ's factual findings are conclusive if "substantial evidence consisting of relevant evidence as a reasonable person would accept as adequate to support a conclusion exists." *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citation and quotations omitted). The Court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the

proper legal analysis has been conducted mandates reversal." *Keeton*, 21 F.3d at 1066 (citations omitted).

    C.    *Discussion*

Plaintiff contends the ALJ erred because (1) he did not consider limitations attributable to her Tarlov cysts in fashioning her RFC; (2) he did not properly assess the severity of her migraines; and (3) he did not weigh the medical opinions of chiropractor Kim Sanders, D.C., primary care physician Fara Nadal, M.D., and physical consultative examiner William Choisser, M.D. in accordance with the revised Social Security Administration (SSA) regulations (Doc. 21).  The Commissioner retorts that the ALJ properly considered Plaintiff's severe and non-severe impairments in combination when assessing Plaintiff's RFC and evaluated the medical evidence for supportability and consistency as the regulations require (Doc. 23).  I agree with the Commissioner.

### *1.   The ALJ properly considered Plaintiff's Tarlov cysts*

Plaintiff contends the ALJ ran afoul of Social Security Ruling (SSR) 96-8p by failing to evaluate Plaintiff's Tarlov cysts and whether they cause functional limitations.[2]  SSR 96-8p guides the ALJ's assessment of a claimant's RFC.  Under SSR 96-8p, the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. . . . Only after that may the RFC be expressed in terms of exertional levels of work, sedentary, light, medium, heavy, and very

---

[2]  A Tarlov cyst is a fluid-filled nerve root cyst found most often at the vertebrae at the base of the spine (the sacral level).  These cysts typically appear along the posterior nerve roots. (R. 342)  Small, asymptomatic Tarlov cysts are present in an estimated five to nine percent of the population. (*Id.*)

heavy." SSR 96-8p, 1996 WL 374184, at *1. The ruling specifically mandates a narrative discussion of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* at *6.

The Eleventh Circuit has held that, even when the ALJ could have been "more specific and explicit" in his or her findings with respect to a plaintiff's "functional limitations and work-related abilities on a function-by-function basis," the findings nonetheless meet the requirements under SSR 96-8p if the ALJ considered all the evidence. *Freeman v. Barnhart*, 220 F. App'x 957, 959 (11th Cir. 2007); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009) (an ALJ's RFC finding is sufficiently detailed despite lacking an express discussion of every function if there is substantial evidence supporting the ALJ's RFC assessment). And, of course, the ALJ is not required to "specifically refer to every piece of evidence in his decision," so long as the decision is sufficient to allow the court to conclude that the ALJ considered the plaintiff's medical condition as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

Here, Plaintiff points to three lumbar spine MRIs conducted on December 11, 2017, February 12, 2018, and January 29, 2019, all of which showed spinal cysts. At a bird's eye level, the ALJ's decision demonstrates that he considered these MRI findings in connection with all the evidence in the record, including evidence of Plaintiff's severe and non-severe impairments. For example, the ALJ stated that he formulated Plaintiff's RFC "[a]fter careful consideration of the entire record," including all Plaintiff's symptoms "and the extent to

which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on 20 C.F.R. § 404.1529 and SSR 16-3p."[3] (R. 24-25)  The ALJ discussed the medical evidence of record, devoting nine pages of his opinion to a summary of Plaintiff's medical history (including the lumbar spine MRIs), hearing testimony, a statement from Plaintiff's former employer, and other statements in the record regarding her alleged limitations. (R. 25-34)  While he did not include every office visit in the record, the ALJ detailed Plaintiff's treatment for cervical and lumbar spinal impairments, including visits to her chiropractor, primary care doctor, pain management specialists, neurosurgeons (for consultations), neurologists, and rheumatologist, as well as two psychological consultative examinations and two physical consultative examinations.

Zooming in, the ALJ specifically considered the medical evidence of Plaintiff's Tarlov cysts.  On referral from primary care provider Dr. Nadal, Plaintiff consulted with neurosurgeon Stephen Pirris, M.D. on April 3, 2019 (after her three lumbar spine MRIs).  He stated:

> I personally reviewed MRIs of the lumbar spine from 2018 and 2019 and MRI of the cervical spine from 2017 on our PACS system.  Her spinal column is widely patent throughout.  There is mild scoliosis noted in the cervical spine but no spinal cord compression.  There is more disc degeneration in the cervical

---

[3] Social Security Ruling 16-3p cautions that "subjective symptom evaluation is not an examination of an individual's character."  Adjudicators, as the regulations dictate (*i.e.*, 20 C.F.R. § 404.1529), are to consider all the claimant's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the record.  *Id.*  The regulations define "objective evidence" to include medical signs shown by medically acceptable clinical diagnostic techniques or laboratory findings.  20 C.F.R. § 404.1529.  "Other evidence," again as the regulations define, includes evidence from medical sources, medical history, and statements about treatment the claimant has received.  *See* 20 C.F.R. § 404.1513.  Subjective complaint evaluations are the province of the ALJ.  *Mitchell v. Comm'r of Soc. Sec.,* 771 F.3d 780, 782 (11th Cir. 2014).

> spine but this is still very mild.  The lumbar spine appears as normal as any lumbar spine image in a 54-year-old that I have seen.  There is no evidence of any neural compression.  There may be some small nerve root sleeve cysts (Tarlov cysts) that are nonoperative.

(R. 633)  Dr. Pirris referred Plaintiff to a neurologist and rheumatologist for "workup of any neural abnormalities or inflammatory cause of her pain," including EMGs of her arms and legs, because he saw "no anatomic basis to explain her severe pain." (R. 632)

Plaintiff complied with Dr. Pirris's recommendations and treated with neurologist Raid Ossi, M.D. later in April 2019. (R. 661-62)  Dr. Ossi ordered lumbar x-rays, which showed minimal to mild multilevel degenerative changes (R. 635), and cervical x-rays and a cervical MRI, which showed "stable to minimal multilevel degenerative change, cervical spine[,]" with "associated canal stenosis and foraminal stenosis," but "no acute radiographic abnormality." (R. 637-38)  Plaintiff told Dr. Ossi about her headaches, memory difficulties, coordination problems, blurred vision, and muscle, joint, neck, and back pain. (R. 661-62)  Dr. Ossi observed that Plaintiff walked normally and had normal motor strength and muscle tone.  Her Romberg test was positive.[4] (*Id.*)  Dr. Ossi referred her (in line with Dr. Pirris's suggestion) for a nerve conduction study and electromyography (EMG) testing of her upper and lower extremities, which Plaintiff completed in May 2019. (R. 672-74)

At Plaintiff's follow-up appointment with Dr. Ossi in July 2019, the neurologist interpreted the results of this testing:  Plaintiff had "an abnormal study suggesting mild chronic electrically inactive R-C5 radiculopathy as well as a mild chronic electrically inactive

---

[4]    A Romberg test is positive when a patient is unable to maintain balance with her eyes closed.  A positive test denotes sensory ataxia as the cause of the patient's postural imbalance. *See* "Romberg Test" by Jessica Forbes and Heather Cronovich, *available at* www.ncbi.nlm.nih.gov/books (last visited Mar. 28, 2022).

L-L5 radiculopathy.  No NCS evidence of generalized polyneuropathy.  No MG EMG evidence of active denervation to suggest electrically ongoing lumbar radiculopathy.  All findings are chronic and mild in nature." (R. 691)  And Dr. Ossi "assured the patient that there is no active ongoing neuropathic or myopathic changes at this time. . . . No further neurological investigation are required at this time." (*Id.*)

Additionally, Dr. Pirris reviewed the results of Plaintiff's May 2019 testing and her updated imaging at a follow-up July 2019 appointment.  He wrote:

> I reviewed her updated studies including MRI of the cervical spine, multiple x-ray studies and an EMG.  There are degenerative changes throughout her entire spinal canal.  However, there is no significant neural compression that would lend itself to a surgical procedure.  There is spondylosis noted on the x-rays but no dynamic instability in either the neck or the back.  Scoliosis x-ray shows slight positive sagittal balance which is partially due to some thoracic hyperkyphosis.  EMG had mild chronic radiculopathy findings but the overall results were very underwhelming in the report.

(R. 709)  In the end, Dr. Pirris concluded:  "I do not have anything to offer her from a spine surgical perspective and she does not need to follow up with me." (*Id.*)

The ALJ summarized Plaintiff's MRI findings, which showed her Tarlov cysts, and Plaintiff's follow-up x-rays and nerve conduction and EMG studies. (R. 27-30) The ALJ emphasized Drs. Ossi and Pirris's conclusions that Plaintiff's extensive neurological work-up showed essentially mild findings. (*Id.*)  Despite this, in her brief, Plaintiff explains the nature of Tarlov cysts and underscores that she has them (Doc. 21 at 18).  But the ALJ does not dispute this.  Importantly, none of Plaintiff's doctors suggested she had any functional limitations related to her Tarlov cysts, and Plaintiff does not point to any contrary evidence, except for Dr. Feigenbaum's letter – submitted to the first time to the AC – opining that Plaintiff's spinal cysts could cause nerve root compression and that Plaintiff needed a

diagnostic nerve root block.  The AC found that this additional evidence does not relate to the period at issue (R. 2), and Plaintiff does not challenge the AC's denial of her request for review of the ALJ's decision (*see* Doc. 21).

In the end, Plaintiff does not offer any specific evidence undermining the ALJ's RFC determination.  *See Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997) (the claimant "bears the burden of proving [s]he is disabled, and, consequently, [s]he is responsible for producing evidence to support [her] claim.").  It bears repeating that a claimant's RFC is a formulation reserved for the ALJ, who, of course, must support his findings with substantial evidence. *Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 486 (11th Cir. 2012) ("A claimant's residual functional capacity is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive."); *Cooper v. Astrue*, 373 F. App'x 961, 962 (11th Cir. 2010) (the assessment of a claimant's RFC and corresponding limitations are "within the province of the ALJ, not a doctor.").   Here, the ALJ has done so.

### 2.   ALJ considered the severity of Plaintiff's migraines

Next, Plaintiff argues "the ALJ failed to adequately analyze the effect of [her] headaches on her ability to perform full time work." (Doc. 21 at 19).  And, "[t]he ALJ did not consider headaches to be a severe impairment meaning that he did not consider the headaches to be even minimally limiting." (*Id*. at 20).  In essence, Plaintiff is making a step two argument – she takes issue with the ALJ's characterization of her headaches as non-severe.  But step two requires only that the ALJ determine whether Plaintiff suffers from at least one severe impairment.  *See Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) (holding

"the finding of any severe impairment . . . whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe" is enough to satisfy step two).   "Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe." *Heatly v. Comm'r of Soc. Sec.*, 385 F. App'x 823, 825 (11th Cir. 2010) (citing *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984)).

The ALJ's determination that Plaintiff's headaches are non-severe only has import if Plaintiff can demonstrate limitations in steps three through five of the sequential evaluation process that the ALJ did not properly consider.   In other words, the issue is not whether the ALJ should have credited Plaintiff's migraines as severe but whether the ALJ properly credited Plaintiff with limitations associated with her impairments, by whatever name. Merely the existence of migraines does not dictate a finding of disability; the ALJ must still determine whether the condition precludes gainful employment.

Anticipating this, Plaintiff contends the ALJ should have considered SSR 19-4p in weighing the evidence of her migraines and concluding she retained the RFC for light work. SSR 19-4p provides guidance on evaluating cases involving primary headache disorders and applies to applications pending on or after August 2019 (including Plaintiff's).   *See* 2019 WL 4169635.   "Primary headache disorders are a collection of chronic headache illnesses characterized by repeated exacerbations of overactivity or dysfunction of pain-sensitive structures in the head."   *Id*. at *3.   Examples of primary headache disorders are migraine headaches, tension-type headaches, and cluster headaches.   *Id*.   The ruling states the agency will consider a claimant's primary headache disorder to be a medically determinable impairment (MDI) if it is "established by objective medical evidence from an acceptable

medical source (AMS)," and a disability finding based on primary headache disorder will not be made "based on a person's statement of symptoms alone." *Id.* at *5. The ruling explains that the Commissioner will "establish a primary headache disorder as an MDI by considering objective medical evidence (signs, laboratory findings, or both) from an AMS" and that, when assessing a claimant's RFC, "[c]onsistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC." *Id.* at *6.

According to Plaintiff, "the ALJ failed to examine the headaches as a separate impairment, even though the headaches were referred to as debilitating and severe by the treating medical providers in this case." (Doc. 21 at 20). I disagree that this argument warrants remand. First, Plaintiff overlooks that the ALJ referred to her headaches throughout his decision. The ALJ noted Plaintiff's former employer's comment that Plaintiff suffered migraines on the job and "experienced more headaches and back pain" in the four years before she quit. (R. 27) The ALJ recounted Plaintiff's complaints of "neck pain, occipital headaches, and low back pain that radiated to her right hip" to neurosurgeon Andrew Cannestra, M.D. during a consultation in February 2018. (*Id.*) The ALJ wrote that Plaintiff "reported headaches, memory difficulties, coordination problems," and other issues to Dr. Ossi in April 2019. (R. 28) The ALJ summarized Dr. Sanders's medical source statement that Plaintiff had one headache a month, and it lasted from one to three days. (R. 31) Also included in the ALJ's decision is Plaintiff's report of severe headaches to psychological consultative examiner Lauren Lucas in July 2018,and to rheumatologist Asmita Patel, M.D. in May 2019. (R. 29, 32)

Second, while SSR 19-4p requires that "imaging . . . is not required for a primary headache disorder diagnosis[,]" it does not state that there is no objective way to diagnose migraine disorder.  2019 WL 4169635, at *4.  To the contrary, SSR 19-4p recognizes that "[p]hysicians diagnose a primary headache disorder after reviewing a person's full medical and headache history and conducting a physical and neurological examination."  *Id.* Although Plaintiff cites to her reports of migraine pain, SSR 19-4p states explicitly that a primary headache disorder cannot support a disability finding on a claimant's reports of symptoms alone.  In other words, Plaintiff asks the Court to infer that a medical provider's reference to Plaintiff's own complaints of headaches necessarily suggests there were objective signs and findings to support the treatment of them.  At most, this is an invitation for the Court to reweigh the evidence or substitute its own judgment for that of the ALJ, which I will not do.

Additionally, Plaintiff does not point to evidence of functional limitations related to her headaches beyond those the ALJ identified in his RFC assessment.  To the extent Plaintiff suggests that her medical records contain opinions the ALJ failed to weigh, she does not identify these medical opinions, and the Court will not do this work for her.  *See Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Armstrong v. Jones*, No. 16-cv-14276-ROSENBERG, 2018 WL 11246687, at *6 (S.D. Fla. June 8, 2018) ("A district court cannot be expected to do a petitioner's work for him."), *report and recommendation adopted*, 2018 WL 11246685 (S.D. Fla. July 13, 2018); *Chavez v. Sec'y Fla. Dep't of Corr.*, 647

13

F.3d 1057, 1061 (11th Cir. 2011) (stating that "district court judges are not required to ferret out delectable facts buried in a massive record").   Plaintiff's second argument fails.

### 3.   ALJ considered the medical evidence in accordance with revised regulations

Lastly, Plaintiff argues the ALJ erred "in rejecting the treating opinions of Dr. Nadal, Dr. Sanders, and the consultative opinion of Dr. Choisser.  Contrary to the ALJ's analysis, their opinions are consistent with each other's opinions and with the medical evidence which consistently revealed abnormal MRI findings." (Doc. 21 at 21).  The Commissioner responds that the ALJ evaluated the medical source opinions in accordance with applicable regulations (Doc. 23 at 19), and I agree.

Before March 27, 2017, Social Security Administration ("SSA") regulations codified the treating physician rule, which required the ALJ to assign controlling weight to a treating physician's opinion if it was well supported and not inconsistent with other record evidence. *See* 20 C.F.R. § 404.1527(c).  Under the treating physician rule, if an ALJ assigned less than controlling weight to a treating physician's opinion, he or she had to provide good cause for doing so. *See Winschel v. Comm'r of Soc. Sec*, 631 F.3d 1176, 1178-79 (11th Cir. 2011).

In this case, however, revised SSA regulations (published on January 18, 2017, and effective on March 27, 2017) apply because Plaintiff filed her claim on January 5, 2018.  As the SSA explained, "under the old rules, courts reviewing claims tended to focus more on whether the agency sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision ... these courts, in reviewing final agency decisions, are reweighing evidence instead of applying the substantial evidence standard of review, which is intended to be highly deferential to us." Revisions to Rules

14

Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017); *see also Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1259 n.4 (11th Cir. 2019).

The new regulations require an ALJ to apply the same factors when considering the opinions from *all* medical sources. 20 C.F.R. § 404.1520c(a). As to each medical source, the ALJ must consider: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c). But the first two factors are the most important: "Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them primarily on the basis of supportability and consistency." *Mackey v. Saul*, 2020 WL 376995, at *4, n. 2 (D.S.C. Jan. 6, 2020), citing 20 C.F.R. § 404.1520c(a),(c)(1)-(2) (while there are several factors ALJs must consider, "[t]he most important factors ... are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section).").

"Supportability" refers to the principle that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). "Consistency" refers to the principle that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). Put differently, the ALJ must analyze whether the medical source's opinion is (1) supported by the source's own

records; and (2) consistent with the other evidence of record. *See Cook v. Comm'r of Soc. Sec.*, No. 6:20-cv-1197-RBD-DCI, 2021 WL 1565832, at *3 (M.D. Fla. Apr. 6, 2021), *report and recommendation adopted*, 2021 WL 1565162 (M.D. Fla. Apr. 21, 2021).

The new regulations also change the standards the ALJ applies when articulating his or her assessment of medical source opinions. As mentioned above, an ALJ need not assign specific evidentiary weight to medical opinions based on their source. *See Tucker v. Saul*, No. 4:19-cv-759, 2020 WL 3489427, at *6 (N.D. Ala. June 26, 2020). While the ALJ must explain how he or she considered the supportability and consistency factors, the ALJ need not explain how he or she considered the other three factors.[5] 20 C.F.R. § 404.1520c(b)(2). And, in assessing the supportability and consistency of a medical opinion, the regulations provide that the ALJ need only explain the consideration of these factors on a source-by-source basis – the regulations do not require the ALJ to explain the consideration of each opinion from the same source. *See* 20 C.F.R. § 404.1520c(b)(1).

But whether these new regulations eliminate the judicially-created treating physician rule – a longstanding requirement in this Circuit, *see Winschel*, 631 F.3d at 1179 – is an open question. *See Beasley v. Comm'r of Soc. Sec.*, No. 2:20-cv-445-JLB-MRM, 2021 WL 4059895, at * 3-4 (M.D. Fla. Sept. 7, 2021). District courts have diverged in their approaches. *Compare Bevis v. Comm'r of Soc. Sec.*, No. 6:20-cv-579-LRH, 2021 WL 3418815, at *5 (M.D. Fla. Aug. 5, 2021) (collecting cases and applying good cause standard "in the absence of binding or

---

[5] The exception is when the record contains differing but equally persuasive medical opinions or prior administrative medical findings about the same issue. *See* 20 C.F.R. § 404.1520c(b)(3).

persuasive authority to the contrary" but noting it was non-issue – under both standards, ALJ's opinion was substantially supported)[6], *with Miller v. Kijakazi*, No. 4:20-cv-656-GMB, 2021 WL 4190632 (N.D. Ala. Sept. 14, 2021) (citing *Chevron, U.S.A., Inc. v. Nat'l Res. Defense Council, Inc.*, 467 U.S. 837, 845 (1984), and finding treating physician rule inapplicable; plaintiff did not cite Eleventh Circuit case stating the Act mandates it and did not argue the new regulations are arbitrary, capricious, or otherwise invalid), *Carr v. Comm'r of Soc. Sec.*, No. 1:20-cv-217-EPG, 2021 WL 1721692 (E.D. Cal. Apr. 30, 2021) (finding new regulations entitled to *Chevron* deference; treating physician rule yields to new regulations because it conflicts with them), *Wiginton v. Comm'r of Soc. Sec.*, 3:20-cv-5387-LC/MJF, 2021 WL 3684264 (N.D. Fla. Aug. 3, 2021) (applying new regulations without discussing whether Eleventh Circuit precedent regarding the treating physician rule applies), *and Devra B.B. v. Comm'r of Soc. Sec.*, 6:20-cv-643(BKS), 2021 WL 4168529 (N.D.N.Y. Sept. 14, 2021) (rejecting Plaintiff's argument that the new regulations conflict with the treating physician rule and are therefore invalid).

The Eleventh Circuit has not spoken directly on the issue in a published opinion. *See Simon* II, 7 F.4th at 1104, n.4 ("[W]e need not and do not consider how the new regulation

---

[6] In finding the treating physician rule still applies, the *Bevis* court cited *Simon v. Comm'r of Soc. Sec.*, 1 F.4th 908, 912 n.4 (11th Cir. 2021) ("*Simon I*"), a July 9, 2021 decision the Eleventh Circuit withdrew on rehearing on August 12, 2021, and substituted with *Simon*, 7 F.4th 1094 (11th Cir. 2021) ("*Simon II*"), seven days after *Bevis* was decided.  In a *Simon I* footnote, the Eleventh Circuit stated that the length of a claimant's treating relationship with her doctor was still an important factor to consider under the new regulations.  1 F.4th at 914 n. 4; *see also Brown v. Comm'r of Soc. Sec.*, No. 6:20-cv-840-GJK, 2021 WL 2917562(M.D. Fla. July 12, 2021) (citing *Simon I* and emphasizing that under new regulations, length of treating relationship must still be considered).  That footnote was *dicta*, however, as *Simon I* and *II* were decided under the old regulations.  Interestingly, *Simon II* omits the *Simon I* footnote.

bears upon our precedents requiring an ALJ to give substantial or considerable weight to a treating physician's opinions absent good cause to do otherwise."). But in a recent unpublished opinion, *Marilyn Matos v. Commissioner of Social Security*, No. 21-11764, 2022 WL 97144, at * 4 (11th Cir. Jan. 10, 2022), the Eleventh Circuit found that the ALJ's assessment of a treating source's medical opinion was legally sufficient where the ALJ only considered the medical opinion's supportability and consistency "in accordance with the SSA's new regulatory scheme." *Id.* The *Matos* court stated that the new regulations "no longer require [] the ALJ to either assign more weight to medical opinions from a claimant's treating source or explain why good cause exists to disregard the treating source's opinion." *Id.* (emphasis added).

Here, Plaintiff does not address whether the new regulations invalidate the Eleventh Circuit's treating source rule (*see* Doc. 21). Considering this and *Matos*, the Court finds that the ALJ was not required to demonstrate good cause to find Plaintiff's treating source opinions unpersuasive. Instead, the ALJ, in accordance with 20 C.F.R. § 404.1520c(c), must consider the persuasiveness of Plaintiff's medical opinions and evaluate them primarily based on supportability and consistency. Here, he did so.

Regarding Dr. Nadal's records, as Plaintiff's primary care doctor she treated Plaintiff for anxiety, IBS, and neck and back pain and performed Plaintiff's well woman exams. In November 2017, Plaintiff told Dr. Nadal that she visited a chiropractor (Dr. Sanders) once a week with only some relief and that her pain management doctor had administered trigger point injections, which also provided only minor relief. (R. 507) On this basis, Dr. Nadal ordered Plaintiff's December 2017 lumbar MRI (discussed above). Then, in March 2018,

Plaintiff told Dr. Nadal that her neck and back pain and headaches incapacitate her.  She said she cannot sweep, vacuum, or mop and can sit for only 30 minutes at a time, stand for 15 minutes at a time, and cannot lift more than 10 pounds. (R. 513)  Nonetheless, Dr. Nadal endorsed "continued conservative treatment to include chiropractic adjustment, nerve blocks, epidural injections.  Consider acupuncture." (R. 515)

That same month -- March 2018 -- Dr. Nadal completed a medical source statement. (R. 497-501)  She said she had treated Plaintiff at least once a year for 10 years and had diagnosed Plaintiff with cervical and lumbar disc disease and IBS. (R. 497)  Plaintiff had a fair prognosis, Dr. Nadal said. (*Id.*) Plaintiff had decreased range of motion and pain in her cervical and lumbar spine, along with muscle spasms and tenderness.  Her neck and lower back were in "constant pain." (*Id.*)  Standing, walking, bending, lifting, and rolling over in bed aggravated her pain.  Due to Plaintiff's pain, she could walk less than a block, stand for 15 minutes at a time, and sit and stand/walk for less than two hours at a time each. (R. 497-98) She could occasionally lift up to 10 pounds, rarely lift 10 pounds, and never lift more than 10 pounds. (R. 499)  She would likely be off task more than 25% of a work day and would be absent from work more than four days a month. (R. 500)  Dr. Nadal wrote that Plaintiff's pain is constant, causes her great emotional distress and intermittent panic attacks, and requires bed rest. (R. 500-01)

Then, during a February 2019 office visit, Plaintiff told Dr. Nadal that her quality of life was low due to her pain level – she could no longer do household chores, cook, or garden, epidural injections and nerve blocks made her pain worse, and chiropractic treatments no longer helped. (R. 615)  She was interested in surgical options and mentioned she wanted a

second opinion after neurosurgeon Dr. Cannestra examined her in February 2018 and found Plaintiff had full strength and full range of motion in her upper and lower extremities, no lumbar or neck muscle spasms, normal muscle tone, intact coordination, and a non-antalgic gait. (R. 504-05, 615)  So, Dr. Nadal referred Plaintiff to Dr. Pirris who, as explained earlier in the Order, treated Plaintiff twice (in April and July 2019), found Plaintiff's imaging unremarkable, and did not recommend surgery.

Against this backdrop, the ALJ found Dr. Nadal's medical source statement unpersuasive because it was inconsistent with the physician's own treatment notes and unsupported by other medical evidence.  Substantial evidence supports this.  Dr. Nadal's treatment notes before and after her medical source statement show relatively normal findings.  Despite that Dr. Nadal mentioned Plaintiff had anxiety and panic attacks, Plaintiff did not receive any mental health treatment during the relevant period.  Next, Dr. Nadal did not refer her to a gastroenterologist despite allegedly disabling IBS.  And Drs. Pirris, Ossi, and Cannestra all reviewed Plaintiff's imaging and recommended conservative treatment (as summarized earlier in this Order).

Next up is the ALJ's consideration of Dr. Sanders's treatment.  Dr. Sanders provided Plaintiff chiropractic adjustments and non-surgical spinal decompression for her cervical and lumbar pain several times per month from March 2016 until January 2019. (R. 353-496, 590-610)   Interestingly, Dr. Sanders's treatment notes are almost completely identical appointment to appointment.  For example, Dr. Sanders noted that Plaintiff "is improving as expected[,]" and she recommended Plaintiff "continue the existing treatment plan." (*See, e.g.,*

R. 359-70)  And in every treatment note Dr. Sanders writes that Plaintiff "is following her wellness plan and showing an increase in overall health and well-being."  (*Id.*)

In March 2018 (the same month as Dr. Nadal's medical source statement), Dr. Sanders completed a medical source statement with findings very similar to those of Dr. Nadal. (R. 353-57) The ALJ found Dr. Sanders's medical source statement unpersuasive, and I agree.  First, a chiropractor is not an acceptable medical source under the regulations and, consequently, Dr. Sanders was not qualified to provide a medical opinion.  Second, Dr. Sanders's treatment notes indicate without exception that Plaintiff was improving and was doing well.  Third, for the reasons explained earlier in this Order, Dr. Sanders's medical source statement is inconsistent with the treatment notes of Drs. Ossi, Pirris, Cannestra, and Nadal.

Finally, Plaintiff contends the ALJ erroneously weighed Dr. Choisser's consultative opinion.  Dr. Choisser completed a consultative examination at Plaintiff's request in July 2019, the same month as Plaintiff's follow-up appointments with Drs. Pirris and Ossi (who noted unremarkable findings), and completed a medical source statement based on his findings and review of Plaintiff's imaging and treatment records. (R. 693-701) Dr. Choisser wrote that Plaintiff was uncomfortable in any position, had a significantly decreased range of motion in her cervical spine, reduced range of motion in her cervical spine and hips, muscle spasms, motor loss, muscle weakness, and reflex loss. (R. 694-95) She had difficulty walking heel to toe and fell over backwards during the Romberg test. According to Dr. Choisser, Plaintiff could sit, stand, and walk for only two hours during an eight-hour workday and could rarely lift less than 10 pounds. (R. 696-700)  She had limited use of her hands, fingers, and

arms.  She would be off task 25 percent of a typical workday and would miss more than four days of work per month. (*Id.*)

Although the ALJ noted that Dr. Choisser's medical source statement was consistent with his consultative exam findings, the ALJ found his opinions unpersuasive.  Specifically, "Dr. Choisser's exam findings are inconsistent with the objective exam findings of the claimant's primary care physician [Dr. Nadal], the claimant's rheumatologist [Dr. Patel], the claimant's neurologist [Dr. Ossi], and the claimant's neurosurgeon [Dr. Pirris].   Dr. Choisser's exam findings are inconsistent with the objective imaging studies and course of treatment." (R. 33-34)   But Plaintiff counters that Dr. Choisser's findings are actually consistent with Drs. Sanders's and Nadal's.  This is easy to debunk.  The ALJ found Drs. Nadal and Sanders's medical source statements inconsistent with their own objective findings and treatment.  In other words, although Dr. Choisser's opinions may be consistent with Drs. Nadal's and Sanders's medical source statements, the ALJ relied on substantial evidence in finding all these opinions unpersuasive.  Plaintiff's final argument fails.

     *D.*    *Conclusion*

For the reasons stated above, it is ORDERED:

    (1) The Commissioner's decision is AFFIRMED; and

    (2) The Clerk of Court is directed to enter judgment for Defendant and close the case.

DONE and ORDERED in Tampa, Florida on March 29, 2022.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE